Slip Op. 14-4

## UNITED STATES COURT OF INTERNATIONAL TRADE

CHANGSHAN PEER BEARING
COMPANY, LTD. AND PEER BEARING
COMPANY,

        Plaintiffs,

        v.

UNITED STATES,

        Defendant,

        and

THE TIMKEN COMPANY,

        Defendant-intervenor.

Before: Timothy C. Stanceu, Judge

Court No. 12-00039

## OPINION AND ORDER

[Remanding to the U.S. Department of Commerce the final results of an administrative review of an antidumping duty order on tapered roller bearings from the People's Republic of China]

Dated: January 15, 2014

*Herbert C. Shelley* and *Christopher G. Falcone*, Steptoe & Johnson LLP, of Washington, DC, for plaintiffs Changshan Peer Bearing Company, Ltd. and Peer Bearing Company.

*Tara K. Hogan*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With her on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director. Of counsel on the brief was *Joanna Theiss*, Office of the Chief Counsel for Import Trade Administration, U.S. Department of Commerce, of Washington, DC.

*Terence P. Stewart*, *William A. Fennell*, and *Stephanie R. Manaker*, Stewart and Stewart, of Washington, DC, for defendant-intervenor The Timken Company.

Stanceu, Judge: Plaintiffs Changshan Peer Bearing Company, Ltd. and Peer Bearing

Company contest the final determination ("Final Results") issued by the International Trade

Administration, U.S. Department of Commerce ("Commerce" or the "Department") to conclude

the twenty-third administrative review of an antidumping duty order on tapered roller bearings

("TRBs") and parts thereof, finished and unfinished (the "subject merchandise"), from the

People's Republic of China ("China").  Compl. ¶ 1 (Feb. 1, 2012), ECF No. 6.  *See Tapered*

*Roller Bearings & Parts Thereof, Finished & Unfinished, from the People's Republic of China:*

*Final Results of the 2009-2010 Antidumping Duty Admin. Review & Rescission of Admin.*

*Review, In Part*, 77 Fed. Reg. 2,271, 2,273 (Jan. 17, 2012) ("*Original Final Results*"), as

amended; *Tapered Roller Bearings & Parts Thereof, Finished & Unfinished, from the People's*

*Republic of China: Am. Final Results of the Admin. Review of the Antidumping Duty Order*,

77 Fed. Reg. 24,179 (Apr. 23, 2012) ("*Am. Final Results*") (collectively, the "*Final Results*").

The twenty-third administrative review covers entries made between June 1, 2009 and

May 31, 2010 (the "period of review" or "POR.")  *Id.* at 24,179.

 Before the court is plaintiffs' USCIT Rule 56.2 motion for judgment on the agency

record, which defendant United States and defendant-intervenor The Timken Company

("Timken"), the petitioner in the original investigation, oppose.  Pls.' R. 56.2

Mot. for J. on the Agency R. (June 29, 2012), ECF No. 24-1 ("Pls.' Mot."); Def.'s Opp'n to Pls.'

Mot. for J. on the Agency R. (Aug. 29, 2012), ECF No. 32 ("Def.'s Opp'n"); The Timken

Co.'s Opp'n to Pls.' Mot. for J. on the Agency R. (Sept. 4, 2012), ECF No. 33

("Def.-intervenor's Opp'n").  Plaintiffs challenge the Department's method of determining a

surrogate value for the bearing-quality alloy steel bar used to produce some of the subject

merchandise sold during the twenty-third review.  Changshan Peer Bearing Co., Ltd.'s & Peer

Bearing Co.'s Mem. of P. & A. in Supp. of its Mot. for J. on the Agency R.  2-3 (June 29, 2012),

ECF No. 24 ("Pls.' Mem.").  Plaintiffs seek a court order remanding the *Final Results* and

requiring Commerce to reconsider the valuation.  Pls.' Mem. 1.  Additionally, plaintiffs seek an

order directing Commerce to reopen the administrative record on remand so that plaintiffs may

submit new information pertaining to the valuation issue.  *Id.* 3, 15, 18.

      The court decides that a remand is required because the *Final Results* fail to provide a

finding or explanation addressing the statutory requirement that the steel bar be valued according

to the "best available information."  The court, however, will leave to the Department's

discretion the decision on whether to reopen the record.

## I. BACKGROUND

### 1. Procedural History

      In 1987, Commerce issued the antidumping duty order on tapered roller bearings and

parts thereof from China (the "Order").  *Antidumping Duty Order; Tapered Roller Bearings &*

*Parts Thereof, Finished or Unfinished, from the People's Republic of China*,

52 Fed. Reg. 22,667 (June 15, 1987).  In response to a request by various parties, Commerce, on

July 28, 2010, initiated the twenty-third administrative review under section 751 of the Tariff

Act, 19 U.S.C. § 1675(a).  *Initiation of Antidumping & Countervailing Duty Admin. Reviews &*

*Requests for Revocations In Part*, 75 Fed. Reg. 44,224 (July 28, 2010).  Commerce issued

preliminary results of the review ("Preliminary Results") on July 13, 2011, calculating a

preliminary weighted-average dumping margin of 5.61% for CPZ/SKF, the only individually-

examined respondent.  *Tapered Roller Bearings & Parts Thereof, Finished or Unfinished, from*

*the People's Republic of China: Preliminary Results of the 2009-2010 Admin. Review of the*

*Antidumping Duty Order & Intent to Rescind Admin. Review, In Part*, 76 Fed. Reg. 41,207,

41,214 ("*Preliminary Results*").  On January 17, 2012, Commerce issued final results, assigning

a weighted-average dumping margin of 10.03%.  *Original Final Results*, 77 Fed. Reg. at 2,273.

On April 23, 2012, Commerce, with leave of court to correct a ministerial error, issued amended

final results and revised the weighted-average dumping margin to 14.98%.[1]  *Am. Final Results*,

77 Fed. Reg. at 24,179.

      Plaintiffs filed their Rule 56.2 motion and accompanying memorandum on

June 29, 2012.[2]  Pls.' Mot. 1; Pls.' Mem. 1.  Defendant and defendant-intervenor each filed

responses in opposition on August 29 and September 4, 2012, respectively, Def.'s Opp'n; Def.-

intervenor's Opp'n, and on October 9, 2012, plaintiffs filed a reply.  Pls.' Reply Br. in Supp. of

its Mot. for J. on the Agency R., ECF No. 39.  The court held oral argument on June 21, 2013.

ECF No. 44.

## 2. Factual History

      During the period of the prior (twenty-second) administrative review of the Order, a

Swedish conglomerate, AB SKF ("SKF"), acquired Peer Bearing Company-Changshan

("PBCD," or as referred to by Commerce in the *Final Results*, "CPZ/PBCD"), a Chinese

---

[1] On January 23, 2012, The Timken Company ("Timken") submitted an allegation of a
ministerial error regarding the valuation of the steel bar input in the Final Results.  *Mem. from
Demitri Kalogeropoulos to Wendy J. Frankel, re: Allegation of Ministerial Error*, at 3
(Apr. 16, 2012).  Before the Department took action on the alleged ministerial error, Timken and
plaintiffs each commenced actions in this Court.  Summons (Jan. 27, 2012), ECF No. 1 (Court
No. 12-00035), Compl. (Jan. 30, 2012), ECF No. 7 (Court No. 12-00035); Summons
(Feb. 1, 2012), ECF No. 1; Compl. ¶ 1 (Feb. 1, 2012), ECF No. 6.  On March 29, 2012, the court
granted Commerce leave to amend the *Final Results* to correct the ministerial error, Order,
ECF No. 26 (Court No. 12-00035), and on April 23, 2012 Commerce issued amended final
results, *Tapered Roller Bearings & Parts Thereof, Finished & Unfinished, from the People's
Republic of China: Amended Final Results of the Admin. Review of the Antidumping Duty Order*,
77 Fed. Reg. 24,179 (Apr. 23, 2012) ("*Amended Final Results*").  After Commerce issued the
amended results, Timken voluntarily dismissed its action.  Stipulation of Dismissal
(May 15, 2012), ECF No. 31 (Court No. 12-00035).

[2] Plaintiffs' complaint included an additional claim challenging the Department's
decision to rely on producer-specific factors of production ("FOPs") to calculate the normal
value of the tapered roller bearings ("TRBs") sold during the period of review ("POR").  Compl.
¶¶ 9-10.  Plaintiffs did not pursue this claim in their Rule 56.2 motion.  Pls.' Mem. 5.

producer and exporter of TRBs, and its affiliated U.S. importer and reseller, Peer Bearing

Company.  *See Tapered Roller Bearings & Parts Thereof, Finished & Unfinished, from the*

*People's Republic of China: Final Results of the 2008-2009 Antidumping Duty Admin. Review*,

76 Fed. Reg. 3,086, 3,087 (Jan. 19, 2011) ("*Final Results AR22*").  The acquisition resulted in

two SKF-related entities, Changshan Peer Bearing Company, Ltd. ("CPZ/SKF") and a U.S.

importer and reseller, Peer Bearing Company ("Peer/SKF"), who are the plaintiffs in this action.

*Id.*  During the prior review, Commerce determined that CPZ/SKF and Peer/SKF were not

successors-in-interest to the former companies, *id.*, a determination no party contests in this

action.

     As a result of the acquisition, Peer/SKF came to possess a significant quantity of

previously imported, unsold TRB inventory manufactured by the former Chinese producer,

PBCD.  *See* Issues & Decision Mem., A-570-601, ARP 10-10, at 5-6 (Jan. 9, 2012), *available at*

http://ia.ita.doc.gov/frn/summary/PRC/2012-730-1.pdf (last visited Jan. 9, 2014) ("*Decision*

*Mem.*"); *Letter from Law Firm of Steptoe & Johnson to Secretary of Commerce re: Supplemental*

*Questionnaire C Response* 7 (Mar. 14, 2011) (Admin.R.Doc. No. 6105).  Peer/SKF sold some of

this inventory to unaffiliated U.S. customers during the POR.  *Decision Mem.* 5.  The

Department's valuation of the steel bar used to produce this merchandise is at issue in this case.

## II. DISCUSSION

     The court exercises jurisdiction according to section 201 of the Customs Courts Act

of 1980, 28 U.S.C. § 1581(c).[3]  Under this jurisdictional provision, the court reviews actions

commenced under section 516A of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C.

---

[3] All statutory citations are to the 2006 edition of the United States Code.  All citations to
regulations are to the 2011 edition of the Code of Federal Regulations.

§ 1516a(a)(2)(B)(iii) contesting the final results of an administrative review of an antidumping

duty order.  Upon judicial review, the court will hold unlawful any finding, conclusion, or

determination that is not supported by substantial evidence on the record or that is otherwise not

in accordance with law.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

> 1.  On Remand, Commerce Must Reconsider its Surrogate Value for the Steel Bar Factor
> of Production Pertaining to TRBs Produced by PBCD

In calculating the normal value of subject merchandise from a nonmarket economy

country such as China, Commerce, under subsection (1) of section 773(c) of the Tariff Act,

ordinarily determines a "surrogate" value for each of the factors of production ("FOPs") utilized

in producing the merchandise and adds amounts for general expenses, profit, and other expenses.

*See* 19 U.S.C. § 1677b(c)(1).  As is relevant here, the FOPs include "quantities of raw materials

employed."  *Id.* at § 1677b(c)(3)(B).  The statute provides that Commerce is to value FOPs

"based on the *best available information* regarding the values of such factors in a market

economy country or countries" that Commerce considers appropriate.  *Id.* § 1677b(c)(1)

(emphasis added).  In valuing FOPs, the statute requires Commerce to "utilize, to the extent

possible, the prices or costs of factors of production in one or more market economy countries

that are—(A) at a level of economic development comparable to that of the market economy

country, and (B) significant producers of comparable merchandise."  *Id.* § 1677b(c)(4).

Although Commerce is entitled to deference in its interpretation of the term "best

available information," *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1323

(Fed. Cir. 2011), the selection of the best available information must be consistent with the

overall purpose of the antidumping statute, which is "to determine margins 'as accurately as

possible.'" *Lasko Metal Products, Inc. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994)

(quoting *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).

Moreover, although Commerce has discretion in selecting a method for valuing FOPs, the court

will not sustain the Department's selection absent reasoning that adequately explains the

Department's choice.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 43 (1983).

In the *Final Results*, Commerce employed different methods for valuing the steel bar

input depending on whether CPZ/SKF or the former producer, PBCD, manufactured the subject

TRBs.  *Original Final Results*, 77 Fed. Reg. at 2,273.  For the valuation of the steel bar

CPZ/SKF used, which plaintiffs do not contest, Commerce used a weighted-average of price data

obtained from CPZ/SKF's market-economy purchases of bearing-quality steel bar made during

the POR.  *Id.* at 2,273.  In valuing the bearing-quality steel bar PBCD used to produce TRBs,

which plaintiffs do contest, Commerce used import data from India that Timken had placed on

the record, which pertained to Indian "harmonized tariff schedule ('HTS') subcategory

7228.30.29 (other bars and rods of other alloy steel)."  *Id.*; *see CPZ/SKF Final Analysis Mem. to

File*, A-570-601, ARP 5-10, at 3 & Atts. 1, 3 (Jan. 9, 2012) ("*Final Analysis Mem.*"); *Memo re:

Factors Valuations of the Final Results of the 2009-2010 Admin. Review of the Antidumping

Duty Order on Tapered Roller Bearings & Parts Thereof, Finished or Unfinished, from the

People's Republic of China*, at 2 (Jan. 9, 2012), ECF No. 31-3 ("*Factors Valuation Memo*").

The average unit value for Indian subheading 7228.30.29 as shown in the Indian HTS

data, $105.43 INR per kilogram, is significantly higher than the average unit value of the market-

economy prices reported by CPZ/SKF.  *Compare Factors Valuation Memo* at 2, *with Final

Analysis Mem.* at Attach. 2.  Plaintiffs argue that Commerce instead should have used the prices

from CPZ/SKF's market-economy purchases to value the steel bar inputs that PBCD used to

produce the subject merchandise sold during the POR, as Commerce did in the Preliminary

Results.[4]  Pls.' Mem. 2-3.  Plaintiffs request that the court order Commerce to follow this course

on remand.  Pls.' Mot. 2.  In the alternative, plaintiffs ask the court to direct Commerce to:

(1) reopen the administrative record so that plaintiffs may submit factual information for use in

determining a new surrogate value for the steel bar input; and (2) determine whether the Indian

surrogate value was aberrational and, if Commerce determines that it was, to choose a new

surrogate value.  *Id*.

     The record contains only two data sources that Commerce could use in obtaining a

surrogate value for the steel bar input of the PBCD-produced TRBs: the Indian HTS data and

CPZ/SKF's market economy purchases during the POR.  In formulating the *Final Results*,

Commerce was required to determine which of these two data sources is the "best available

information" for valuing the steel bar FOP.  *See* 19 U.S.C. § 1677b(c)(1).  However, neither the

*Final Results* nor the Department's accompanying Decision Memorandum contains an explicit

finding that the Indian HTS data are superior to the market economy purchase data, which the

Decision Memorandum does not discuss as a possible data source for the valuation.  More

specifically, Commerce failed to address the issue of which of the two available data sets would

---

[4] In the Preliminary Results of the twenty-third review, Commerce calculated the normal value of all subject merchandise sold during the POR, whether produced by the new producer, Changshan Peer Bearing Company, Ltd. or the former producer, Peer Bearing Company-Changshan, using FOPs pertaining to the TRBs made by the new producer.  *Tapered Roller Bearings & Parts Thereof, Finished or Unfinished, from the People's Republic of China: Preliminary Results of the 2009-2010 Admin. Review of the Antidumping Duty Order & Intent to Rescind Admin. Review, In Part*, 76 Fed. Reg. 41,207, 41,211 ("*Preliminary Results*"); *Mem. from Demitri Kalogeropoulos to File, re: Surrogate Value Mem.*, at 2 (June 30, 2011) (Admin.R.Doc. No. 6262) ("*Surrogate Value Mem.*").  Commerce valued all steel bar input using a weighted-average of the market economy prices reported by the new producer.  *Preliminary Results*, 76 Fed. Reg. at 41,212; *Surrogate Value Mem.*, at Ex. 12.

produce the more accurate margin.  *See Lasko*, 43 F.3d at 1443 ("[I]t is Commerce's duty to

determine margins as accurately as possible, and to use the best information available to it in

doing so.").

      As a rationale for the Department's decision, the Decision Memorandum offers only that

Commerce valued certain FOPs, including steel bar input, "using Indian import data already on

the record, consistent with the prior administrative review of this proceeding."  *Decision Mem*. 7

(footnotes omitted).  Almost all of the relevant discussion in the Decision Memorandum pertains

not to the choice of surrogate value but to the choice of FOPs.  *See id.* at 5-7.  This discussion

addresses the Department's reasons for using, where possible, quantitative FOP data from the

actual producer of the subject merchandise in question, *i.e.*, PBCD, pertaining to the previous

POR, instead of FOP data from the new entity, CPZ/SKF, pertaining to the POR of the current

review.  *Id.*  Missing is any meaningful discussion of how the Department reached its decision on

*valuing*, as opposed to *quantifying*, the steel bar FOP.

      On the whole, the court cannot sustain upon judicial review the Department's decision to

use the Indian import data to value the steel bar input for the PBCD-produced subject

merchandise because Commerce did not support the decision with an adequate explanation and

because Commerce gave no indication that it considered the alternative.  *See Motor Vehicle*

*Mfrs. Ass'n*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a

satisfactory explanation for its action including a 'rational connection between the facts found

and the choice made.'" (*citing Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168

(1962))).  The court, therefore, must remand the decision to Commerce for reconsideration.

      Defendant and defendant-intervenor raise several arguments in support of the *Final*

*Results*.  For the reasons discussed below, the court is not persuaded by these arguments.

Defendant states in its opposition to plaintiffs' Rule 56.2 motion that "[b]ecause Commerce used PBCD's factors of production to determine normal value for PBCD-produced TRBs, Commerce valued PBCD's consumption of steel bar using the only surrogate value for this input on the record."  Def.'s Opp'n 13 (citing *Decision Mem.* 7).  The connection to which defendant alludes is not apparent on the face of the Decision Memorandum, and in this respect defendant's statement is a *post-hoc* rationalization rather than reasoning supplied by Commerce. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").  Moreover, defendant's *post-hoc* rationalization is at best questionable.  The decision to use PBCD's factors of production does not compel a decision to choose the Indian import data over CPZ/SKF's market economy purchase data, which, contrary to defendant's assertion, also could serve as a surrogate value for the steel bar used by PBCD.

Defendant argues, further, that "Commerce's practice is to value the input using market-economy purchase prices for the producer who demonstrated that it purchased significant quantities; otherwise, Commerce uses surrogate values."  Def.'s Opp'n 14 (citing 19 C.F.R. § 351.408(c)(1)).  Defendant maintains that "[o]nly SKF, not PBCD, demonstrated that it purchased significant quantities of steel bar from market economy suppliers," *id*. (citation omitted), and so "the only usable alternative data" for valuing PBCD's steel bar input was the Indian data submitted by Timken, *id*.  However, this argument is also a *post-hoc* rationalization. Moreover, what defendant characterizes as a "practice" does not necessarily or unambiguously follow from the regulation defendant cites, which provides:

> *Information used to value factors.*  The Secretary normally will use publicly
> available information to value factors.  However, where a factor is purchased

> from a market economy supplier and paid for in a market economy currency, the
> Secretary normally will use the price paid to the market economy supplier.  In
> those instances *where a portion of the factor is purchased from a market economy*
> *supplier and the remainder from a nonmarket economy supplier*, the Secretary
> *normally* will value the factor using the price paid to the market economy
> supplier.

19 C.F.R. § 351.408(c)(1) (emphasis added).  Commerce addressed this regulation in a 2006

Federal Register notice ("Antidumping Methodologies Notice"), which established a rebuttable

"33%" threshold for the use of market economy purchases as a surrogate value.[5]  *Antidumping*

*Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty*

*Drawback; & Request for Comments*, 71 Fed. Reg. 61,716, 61,717-18 (Oct. 19, 2006)

("*Antidumping Methodologies Notice*").  The Antidumping Methodologies Notice, which is not a

regulation, does not appear to foreclose the option of using the market purchase data to obtain a

surrogate value for the PBCD-produced subject merchandise, as the Department did in the

Preliminary Results.  Yet, the Decision Memorandum contains no discussion of § 351.408(c)(1)

or the Antidumping Methodologies Notice.  Citing the latter, defendant also submits that "[t]o

the extent that SKF is arguing that its market economy purchase prices are the best available

information to value PBCD's consumption of steel bar, there is no legal basis to value PBCD's

consumption with SKF's market economy purchase price . . . ."  Def.'s Opp'n 21 (citing

---

[5] The Federal Register notice announced:
The Department is now instituting a rebuttable presumption that market economy
input prices are the best available information for valuing an entire input when the
total volume of the input purchased from all market economy sources during the
period of investigation or review exceeds 33 percent of the total volume of the
input purchased from all sources during the period.  In these cases, unless
case-specific facts provide adequate grounds to rebut the Department's
presumption, the Department will use the weighted-average market economy
purchase price to value the entire input.
*Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages,*
*Duty Drawback; & Request for Comments*, 71 Fed. Reg. 61,716, 61,717-18 (Oct. 19, 2006).

*Antidumping Methodologies Notice*, 71 Fed. Reg. at 61,716).  The court fails to see why

Commerce would have lacked a "legal basis" to use the CPZ/SKF market economy purchase

data as the surrogate value for the PBCD-produced TRBs had it chosen to do so.

Defendant and defendant-intervenor advance other arguments that also are not based on

the rationale Commerce set forth in the Decision Memorandum.  For example, defendant-

intervenor argues that CPZ/SKF's market economy prices are unreliable because they do not

necessarily reflect those prices that PBCD could have actually obtained due to differences in

CPZ/SKF's and PBCD's business profiles.  Defendant-intervenor also suggests that the

Antidumping Methodologies Notice makes clear that Commerce intended for the 33% threshold

to apply only to individual companies and not to multiple companies.  Def.-intervenor's Opp'n

11, 12-16.  Defendant submits that "the price that SKF paid to market economy suppliers is not

publicly available, and public availability is one important element Commerce must consider in

determining whether a source constitutes the best available information."  *Id*. (citing 19 C.F.R.

§ 351.408(c)(1)).  This *post-hoc* rationale does not address the point that use of market economy

purchase data as surrogate data is expressly contemplated by § 351.408(c)(1) as an exception to

the Department's preference for publicly available data.

    2.  The Court Leaves to the Department's Discretion the Issue of Reopening the Record

Plaintiffs seek an order directing Commerce to reopen the administrative record to allow

submission of additional surrogate value information.  Pls.' Mem. 15-18.  Defendant and

defendant-intervenor oppose plaintiffs' request for an order to reopen the record, should the court

order a remand.  Def.'s Opp'n 19, 22-23; Def.-intervenor's Opp'n 13-15.

In support of their argument, plaintiffs point to: (1) the "limited amount of relevant

information on the record;" (2) a previous remand redetermination by Commerce that "suggests

that the Indian surrogate value chosen by Commerce was aberrational;" and (3) the "significant

amount of additional information available" for valuing bearing-quality steel bar.  Pls.' Mem. 18

(citation omitted).  Relying on *Jinfu Trading Co. Ltd. v. United States*, 31 CIT 996, 1007-08,

2007 WL 1974324, (2007) and *Böwe-Passat v. United States*, 17 CIT 335, 343, 1993 WL

179269 (1993), plaintiffs argue that "[t]his Court has required Commerce to reopen the record to

accept factual information in situations where a respondent was not made aware of Commerce's

intended approach until after the record was closed."  *Id.* at 18-19.  According to plaintiffs,

"there was no indication that the Department would abandon its established thirty-three percent

test and use an Indian surrogate value for the steel bar used in PBCD-produced merchandise."

*Id.* at 19.  Finally, plaintiffs appeal to administrative economy, suggesting that "[d]eclining to

remand and permit the submission of new factual information in situations such as the present

action would encourage parties to submit enormous amounts of factual information and brief

every possible issue, even when the relief sought by a party appears to have been obtained in the

preliminary results."  *Id.*

        The form of the court's remand instructions to an agency are generally a matter of the

court's discretion.  *See* 28 U.S.C. § 2643(c)(1).  In exercising that discretion, the court is guided

by the principle that in most instances, courts review an agency determination on the record on

which that determination was reached, *i.e.*, in this case, the record in front of the agency before

the agency issued the *Final Results*.  Therefore, the court views an order compelling an agency to

reopen an administrative record on remand as the exception rather than the rule, consistent with

the principle that courts, as a general matter, should allow agencies to exercise discretion as to

whether to reopen an administrative record on remand.  *See Essar Steel Ltd. v. United States*,

678 F.3d 1268, 1278 (Fed. Cir. 2012) ("The decision to reopen the record is best left to the

agency . . . .").  Plaintiffs have not made a showing that the circumstances of this case merit an

exception to this general principle.  One of those circumstances is that plaintiffs were afforded,

but did not take advantage of, opportunities to provide additional surrogate value data during the

underlying administrative proceeding.

On November 3, 2010, Commerce first identified six countries as potential surrogate

countries, and on December 7, 2010, Commerce invited all interested parties to submit

comments on the six potential surrogate countries and information for possible use in valuing

FOPs.  *Letter from Commerce to Interested Parties Regarding Surrogate Country Data* 1-2,

Attach. 1 (Dec. 7, 2010) (Admin.R.Doc. No. 5993).  On January 7, 2011, both CPZ/SKF and

Timken submitted comments in which they agreed that India should serve as the primary

surrogate country because it was economically comparable to China, it is a significant producer

of TRBs, and there is available information on the record to value FOPs.  *Letter from Law Firm*

*of Steptoe & Johnson to Secretary of Commerce re: Surrogate Country Selection* 1-2

(Jan. 7, 2011) (Admin.R.Doc. No. 6017); *Letter from Timken to Secretary of Commerce re:*

*Surrogate Country Comments* 2-3 (Jan. 7, 2011) (Admin.R.Doc. No. 6018).  On

January 14, 2011, Timken submitted surrogate data for valuation of various FOPs, including the

steel bar input.  *Letter with Attachment(s) from Law Offices of Stewart & Stewart to Sec'y of*

*Commerce re: The Timken Co.'s Surrogate Value Comments* 7 (Jan. 14, 2011)

(Admin.R.Doc. No. 6030).  Following Timken's submission of the Indian surrogate data,

CPZ/SKF did not submit alternative surrogate data but instead relied on its suggestion that

Commerce should use market economy purchases to value the steel bar input.  *CPZ/SKF's &*

*Peer/SKF's Surrogate Value Comments & Data for the June 1, 2009 to May 31, 2010 Review*

*Period*, at 2-3, A-4 (Jan. 14, 2011) (Admin.R.Doc. No. 6029).  CPZ/SKF's comments relied on a

calculation demonstrating that more than thirty-three percent of the bearing-quality steel bar

consumed by CPZ/SKF during the POR was purchased from market economy suppliers using

U.S. dollars.  *Id.* at A-4.

Timken's submission of the Indian surrogate data placed CPZ/SKF on effective notice

that Commerce potentially could use those data in valuing the steel bar inputs.  *See* 19 C.F.R.

§ 351.301(c)(1).  Nonetheless, in its rebuttal comments filed on January 24, 2011, CPZ/SKF did

not address the issue of the suitability of the Indian data for use as surrogate information in

valuing the steel bar FOP.  *Letter from Steptoe & Johnson Attorneys at Law to Secretary of*

*Commerce re: Surrogate Value Rebuttal Comments* 1 (Jan. 24, 2011) (Admin.R.Doc. No. 6042).

Similarly, after Commerce issued the Preliminary Results on July 13, 2011, in which it selected

India as the surrogate country for valuing most FOPs, Commerce afforded all interested parties

an additional opportunity "to submit publicly available information to value the FOPs within 20

days after the date of publication . . . ."  *Preliminary Results*, 76 Fed. Reg. at 41,209-10 (citing

19 C.F.R. § 301(c)(3)(ii)) (footnote omitted).

The Preliminary Results are just that—preliminary—and CPZ/SKF reasonably could not

presume Commerce would not adopt a different approach in determining the *Final Results*.  The

Department's express invitation in the Preliminary Results to submit more valuation data only

underscores that point.  Although CPZ/SKF was on notice that Timken's data were the sole

surrogate country data for steel bar valuation on the record and that Commerce had chosen India

as the primary surrogate country for the valuation of FOPs, CPZ/SKF did not submit additional

data for potential use in valuing the steel bar FOP.  *Preliminary Results*, 76 Fed. Reg. at 41,209.

Had plaintiffs done so, Commerce would have been required to consider those additional data

before choosing the Indian import data.

In this Opinion and Order, the court is ruling only that Commerce must reconsider its

decision to use the Indian import data to value the steel bar input and that Commerce, on remand,

is not required to reopen the record to allow submission of additional information.  At this point

in the proceeding, the court will not opine on the question of whether the Indian import data, if

used in a redetermination that Commerce reaches upon remand, could satisfy the statutory "best

available information" requirement.  The court notes, however, that the Indian import data are

not particularly specific to the steel bar input being valued and reflect a value much higher than

the data from the market economy purchases, which are highly specific to the input being valued.

The court notes, further, that the extremely limited scope of the existing record is not typical of

those records upon which Commerce ordinarily determines a surrogate value for a critical

production input.  And although CPZ/SKF had various opportunities to develop the record

further, Commerce also had opportunities to place additional data on the record in investigating

the surrogate valuation matter.[6]  The court leaves to the Department's discretion the decision as

to whether to reopen the record, but Commerce should, in exercising that discretion, consider the

likelihood that additional investigation made on the basis of an enhanced record would produce a

more satisfactory result.  *See Lasko*, 43 F.3d at 1443 ("[I]t is Commerce's duty to determine

margins as accurately as possible, and to use the best information available to it in doing so.").

---

[6] *See, e.g.*, *QVD Food Co., Ltd. v. United States*, 34 CIT __, __, 721 F. Supp. 2d
1311, 1318-19 (2010) (noting that Commerce placed World Trade Atlas data on the record);
*Jinan Yipin Corp., Ltd. v. United States*, 31 CIT 1901, 1935, 526 F. Supp. 2d 1347, 1378 (2007)
(citation omitted) (same); *Sichuan Changhong Elec. Co. v. United States*, 30 CIT 1481, 1485,
460 F. Supp. 2d 1338, 1343 (2006) (noting that Commerce placed on the record surrogate value
information obtained from Infodrive India, a fee-based website reporting Indian customs data).
Additionally, in the Preliminary Results of the twenty-third review, Commerce relied on Thai
surrogate data for a purpose for which it determined the Indian surrogate data were not the best
available information.  *Preliminary Results*, 76 Fed. Reg. at 41,209.

### III. CONCLUSION AND ORDER

For the reasons stated in the foregoing, Commerce must reconsider its valuation of Peer

Bearing Company-Changshan's ("PBCD") consumption of bearing-quality alloy steel bar.  Upon

consideration of all papers and proceedings in this action, and upon due deliberation, it is hereby

**ORDERED** that the final determination of the International Trade Administration, U.S. Department of Commerce ("Commerce") in the *Tapered Roller Bearings & Parts Thereof, Finished & Unfinished, from the People's Republic of China: Final Results of the 2009-2010 Antidumping Duty Admin. Review & Rescission of Admin. Review, In Part*, 77 Fed. Reg. 2,271 (Jan. 17, 2012), as amended by the *Tapered Roller Bearings & Parts Thereof, Finished and Unfinished, From the People's Republic of China: Am. Final Results of the Admin. Review of the Antidumping Duty Order*, 77 Fed. Reg. 24,179 (Apr. 23, 2012) be, and hereby is, remanded for reconsideration and redetermination in accordance with this Opinion and Order; it is further

**ORDERED** that Commerce shall reconsider the valuation of bearing-quality alloy steel bar used by PBCD in the production of subject merchandise; it is further

**ORDERED** that Commerce shall issue a Remand Redetermination that recalculates the weighted-average dumping margin of Changshan Peer Bearing Company, Ltd. ("CPZ/SKF") as necessary to fulfill the directives of this Opinion and Order, is supported by substantial evidence on the administrative record viewed as a whole, and is in all respects in accordance with law; it is further

**ORDERED** that in conducting the required remand proceeding, Commerce may exercise its discretion on the question of whether to reopen the administrative record for further development pertaining to the valuation of bearing-quality alloy steel bar used by PBCD in the production of subject merchandise; and it is further

**ORDERED** that Commerce shall file the Remand Redetermination within ninety (90) days of the date of this Opinion and Order, that plaintiffs and defendant-intervenor shall have thirty (30) days from the filing of the Remand Redetermination in which to file with the court comments on the Remand Redetermination, and that defendant shall have fifteen (15) days from the date of the last filing of such comments in which to file with the court any responses to the comments of other parties.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated:  January 15, 2014
        New York, New York