Slip Op. 15-10

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CHANGSHAN PEER BEARING COMPANY, LTD. AND PEER BEARING COMPANY,** | |
| Plaintiffs, | |
| v. | **Before: Timothy C. Stanceu, Chief Judge** |
| **UNITED STATES,** | **Court No. 12-00039** |
| Defendant, | |
| and | |
| **THE TIMKEN COMPANY,** | |
| Defendant-intervenor. | |

## <u>OPINION</u>

[Affirming a determination issued by the International Trade Administration, U.S. Department of Commerce, in response to the court's remand order in litigation challenging the final results of an administrative review of an antidumping duty order on tapered roller bearings from China]

Dated:  February 2, 2015

*Herbert C. Shelley* and *Christopher G. Falcone*, Steptoe & Johnson LLP, of Washington, DC, for plaintiffs Changshan Peer Bearing Company, Ltd. and Peer Bearing Company.

*Tara K. Hogan*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant United States.  With her on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director.  Of counsel was *Justin Ross Becker*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*William A. Fennell*, Stewart and Stewart, of Washington, DC, for defendant-intervenor The Timken Company.  With him on the brief were *Terence P. Stewart* and *Stephanie M. Bell*.

Stanceu, Chief Judge: In this litigation, plaintiffs Changshan Peer Bearing Company, Ltd.

and Peer Bearing Company (collectively, "SKF") contest the final determination (the "Final

Results") issued by the International Trade Administration, U.S. Department of Commerce

("Commerce" or the "Department") to conclude the twenty-third administrative review of an

antidumping duty order on tapered roller bearings ("TRBs") and parts thereof, finished and

unfinished ("subject merchandise"), from the People's Republic of China ("China").  Compl. ¶ 1

(Feb. 1, 2012), ECF No. 6 ("Compl."); *see Tapered Roller Bearings and Parts Thereof, Finished*

*and Unfinished, From the People's Republic of China: Final Results of the 2009-2010*

*Antidumping Duty Administrative Review and Rescission of Administrative Review, in Part*,

77 Fed. Reg. 2,271 (Int'l Trade Admin. Jan. 17, 2012) ("*Original Final Results*"), *as amended*,

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's*

*Republic of China: Amended Final Results of the Administrative Review of the Antidumping*

*Duty Order*, 77 Fed. Reg. 24,179 (Int'l Trade Admin. Apr. 23, 2012) ("*Am. Final Results*")

(collectively, the "*Final Results*").  The review pertained to entries made between June 1, 2009

and May 31, 2010 (the "period of review" or "POR.")  *Am. Final Results*, 77 Fed. Reg.

at 24,179.

     Before the court is the determination ("Remand Redetermination") submitted by

Commerce in response to the court's opinion and order in *Changshan Peer Bearing Co., Ltd. v.*

*United States*, 38 CIT __, 953 F. Supp. 2d 1354 (2014) ("*Changshan Peer Bearing*").  *Final*

*Results of Redetermination Pursuant to Ct. Remand* (Apr. 15, 2014), ECF No. 50 ("*Remand*

*Redetermination*").  For the reasons discussed herein, the court will affirm the Remand

Redetermination.

## I. BACKGROUND

     Background on this litigation is provided in *Changshan Peer Bearing*, 38 CIT at __,

953 F. Supp. 2d at 1355-57, and is supplemented herein.

## 1.  Procedural History

Commerce issued the antidumping duty order on tapered roller bearings and parts thereof from China in 1987 (the "Order").  *Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the People's Republic of China*, 52 Fed. Reg. 22,667 (Int'l Trade Admin. June 15, 1987).  In response to requests by various parties and pursuant to section 751 of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1675(a),[1] Commerce, on July 28, 2010, initiated the twenty-third administrative review of the Order.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocations in Part*, 75 Fed. Reg. 44,224 (Int'l Trade Admin. July 28, 2010).

Commerce issued preliminary results of the review ("Preliminary Results") on July 13, 2011, calculating a preliminary weighted-average dumping margin of 5.61% for Changshan Peer Bearing Company, Ltd., the only individually-examined respondent.  *Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the People's Republic of China: Preliminary Results of the 2009-2010 Administrative Review of the Antidumping Duty Order and Intent To Rescind Administrative Review, in Part*, 76 Fed. Reg. 41,207, 41,214 (Int'l Trade Admin. July 13, 2011) ("*Preliminary Results*").  On January 17, 2012, Commerce issued the Final Results, assigning Changshan Peer Bearing Company, Ltd. a weighted-average dumping margin of 10.03%.  *Original Final Results*, 77 Fed. Reg. at 2,273.  On April 23, 2012, Commerce, with leave of court to correct a ministerial error, issued amended final results that revised the weighted-average dumping margin for Changshan Peer Bearing Company, Ltd. to 14.98%.  *Am. Final Results*, 77 Fed. Reg. at 24,179.

---

[1] All statutory citations are to the 2006 edition of the United States Code.  All citations to regulations are to the 2011 edition of the Code of Federal Regulations, unless noted otherwise.

On February 1, 2012, plaintiffs filed their complaint challenging certain aspects of the

Final Results and seeking a remand to Commerce for reconsideration.  Compl. ¶ 1, Request for J.

& Relief.  On June 29, 2012, plaintiffs filed a motion for judgment on the agency record, which

defendant United States and defendant-intervenor The Timken Company ("Timken") opposed.

Pls.' R. 56.2 Mot. for J. on the Agency R., ECF No. 24 ("Pls.' Mot."); Changshan Peer Bearing

Co., Ltd.'s & Peer Bearing Co.'s Mem. of P. & A. in Supp. of its Mot. for J. on the Agency R.,

ECF No. 24-1 ("Pls.' Br."); Def.'s Opp'n to Pl.'s Mot. for J. on the Agency R. (Aug. 29, 2012),

ECF No. 32 ("Def.'s Opp'n"); The Timken Co.'s Opp'n to Pl.'s Mot. for J. on the Agency R.

(Sept. 4, 2012), ECF No. 33 ("Timken's Opp'n").

In response to plaintiff's motion, the court issued an opinion and order on

January 15, 2014 ordering Commerce to reconsider its method of determining a surrogate value

for certain bearing-quality alloy steel bar used as a material in the production of subject

merchandise.  *Changshan Peer Bearing*, 38 CIT at __, 953 F. Supp. 2d at 1364.  Commerce filed

the Remand Redetermination on April 15, 2014, *Remand Redetermination*, on which plaintiffs

and defendant-intervenor commented on May 15, 2014, Pls.' Comments on Final Results of

Redetermination Pursuant to Remand, ECF No. 57 ("Pls.' Comments"); Comments on Final

Results of Redetermination Pursuant to Ct. Remand, ECF. No. 55 ("Timken's Comments").

Defendant responded to those comments on June 9, 2014.  Def.'s Resp. to Comments Regarding

the Remand Redetermination, ECF No. 59 ("Def.'s Reply").

                                        2.  Factual History

During the period of the prior (twenty-second) administrative review of the Order,

AB SKF ("SKF"), a Swedish entity, acquired the Chinese bearing producer Peer Bearing

Company-Changshan (as referred to by Commerce, "CPZ/PBCD" or "PBCD"), a Chinese

producer and exporter of TRBs, and its affiliated U.S. importer and reseller, Peer Bearing

Company (as referred to by Commerce, "PBCD/Peer").  *See Tapered Roller Bearings and Parts*

*Thereof, Finished and Unfinished, From the People's Republic of China: Final Results of the*

*2008-2009 Antidumping Duty Administrative Review*, 76 Fed. Reg. 3,086, 3,087 (Int'l Trade

Admin. Jan. 19, 2011) ("*Final Results AR22*").  The acquisition resulted in the two SKF-related

entities that are the plaintiffs in this action, Changshan Peer Bearing Company, Ltd.

("CPZ/SKF") and a U.S. importer and reseller, Peer Bearing Company ("Peer/SKF").  *Id.*

During the prior review, Commerce determined that CPZ/SKF and Peer/SKF were not

successors-in-interest to the former companies, *id.*, a determination that no party has contested in

this litigation.

　　　　Upon the acquisition, Peer/SKF came into possession of a quantity of previously

imported, unsold TRB inventory manufactured by the previous Chinese producer, which was

subject merchandise.  *See Tapered Roller Bearings from the People's Republic of China: Issues*

*& Decision Mem. for the Final Results of the 2009-2010 Admin. Review* 5-6, A-570-601,

ARP 05-10 (Public Admin.R. Part 2 Doc. No. 45) (Jan. 9, 2012), *available at*

http://ia.ita.doc.gov/frn/summary/PRC/2012-730-1.pdf (last visited Jan. 26, 2015) ("*Decision*

*Mem.*"); *CPZ/SKF's Supplemental Questionnaire C Resp.* 7 (Mar. 14, 2011) (Public Admin.R.

Part 1 Doc. No. 76).[2]  Peer/SKF sold some of this inventory to unaffiliated U.S. customers

---

[2] Prior to the remand redetermination, there were three administrative records filed with the court.  The first of these administrative records was filed on March 9, 2012 (referred to herein as "Admin.R. Part 1").  The second of these administrative records, in accordance with the issuance of amended final results, was filed on April 30, 2012 (referred to herein as "Am. Admin.R.").  The third of these administrative records was filed on August 8, 2012 and included various documents omitted in the prior administrative record indices (referred to herein as "Admin.R. Part 2").  Letter to the Ct. re: Amendment to the Admin. R. (July 10, 2012), ECF. 31-2.

during the POR.  *Decision Mem.* 5-6.  The Department's determination of the normal value of

this TRB inventory is at issue in this case.

## II. DISCUSSION

### A.  Jurisdiction and Legal Standard

The court exercises jurisdiction according to section 201 of the Customs Courts Act

of 1980, 28 U.S.C. § 1581(c).  Under this jurisdictional provision, the court reviews actions

commenced under section 516A of the Tariff Act, 19 U.S.C. § 1516a(a)(2)(B)(iii), contesting the

final results of an administrative review of an antidumping duty order.  Upon judicial review, the

court will hold unlawful any finding, conclusion, or determination that is not supported by

substantial evidence on the record or that is otherwise not in accordance with law.  19 U.S.C.

§ 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217

(1938).

### B.  The Department's Valuation of the Steel Bar Factor of Production in the Final Results

Under subsection (1) of section 773(c) of the Tariff Act, Commerce, when calculating the

normal value of subject merchandise from a nonmarket-economy country such as China,

ordinarily determines a surrogate value for each of the factors of production ("FOPs") utilized in

producing the merchandise and adds amounts for general expenses, profit, and other expenses.

19 U.S.C. § 1677b(c)(1).  The statute identifies "quantities of raw materials employed" as one of

the factors of production.  *Id.* § 1677b(c)(3)(B).  Commerce is directed to value factors of

production "based on the best available information regarding the values of such factors in a

market economy country or countries" that Commerce considers appropriate.  *Id.*

§ 1677b(c)(1)(B).  When valuing FOPs, the statute requires Commerce to "utilize, to the extent

possible, the prices or costs of factors of production in one or more market economy countries

that are—(A) at a level of economic development comparable to that of the nonmarket economy

country, and (B) significant producers of comparable merchandise." *Id.* § 1677b(c)(4).

In the Final Results, Commerce was required to determine normal value for two different

TRB inventories sold to U.S. customers during the POR.  The first consisted of subject

merchandise manufactured by CPZ/SKF; the second was made up of the aforementioned subject

merchandise manufactured prior to the POR by the previous Chinese producer and acquired by

Peer/SKF as inventory upon the change in ownership. *Decision Mem.* 4-6.  For subject

merchandise produced by CPZ/SKF (whether or not produced during the POR) and sold by

Peer/SKF during the POR, Commerce valued the steel bar FOP using a weighted average of

price data obtained from CPZ/SKF's market-economy-country purchases of bearing-quality steel

bar that were made during the POR. *Id.* at 4-5.  For subject merchandise sold by Peer/SKF

during the POR but drawn from the inventory of TRBs produced by Peer Bearing

Company-Changshan, i.e., subject merchandise produced before the acquisition, Commerce

valued the steel bar FOP using Indian import data obtained from the Global Trade Atlas

("GTA"). *Original Final Results*, 77 Fed. Reg. at 2,273; *Decision Mem.* 6-7.  The GTA data,

which pertained to harmonized tariff schedule ("HTS") subheading 7228.30.29 (other bars and

rods of other alloy steel), were submitted to the record by defendant-intervenor Timken.

*Original Final Results*, 77 Fed. Reg. at 2,273; *Timken's Surrogate Value Submission*, Attach. 4

(Jan. 14, 2011) (Public Admin.R. Part 1 Doc. No. 62).

The average unit value ("AUV") of 105.43 Indian rupees per kilogram for Indian HTS

subheading 7228.30.29, as shown in the Indian import data reported in the GTA, is substantially

higher than the AUV of the market-economy-country purchase prices reported by CPZ/SKF.

*Compare Factors Valuations Mem. for the Final Results* 2 (Jan. 9, 2012) (Public Admin.R.

Part. 2 Doc. No. 47), ECF No. 31-3, *with CPZ/SKF Final Analysis Mem.*, Attach. 2 (Public

Admin.R. Part 2 Doc. No. 25) (Conf. Admin.R. Part 2 Doc. No. 8) (Jan. 9, 2012).  Plaintiffs

claimed that Commerce instead should have used the prices from CPZ/SKF's

market-economy-country purchases to value all steel bar inputs used to produce the subject

merchandise sold during the POR, as Commerce did in the Preliminary Results.[3]  Pls.' Mot. 2.

C.  The Court's Decision in *Changshan Peer Bearing* and the Remand Redetermination

In *Changshan Peer Bearing*, the court found inadequate the rationale Commerce

provided for its decision to use the GTA Indian import data to determine a surrogate value for

the steel bar input pertaining to the merchandise manufactured by the previous producer, Peer

Bearing Company-Changshan.  *Changshan Peer Bearing*, 38 CIT at __, 953 F. Supp. 2d at 1360.

The Decision Memorandum explained only that Commerce valued certain FOPs, including steel

bar input, "using Indian import data already on the record, consistent with the prior

administrative review of this proceeding."  *Decision Mem*. 7 (footnote omitted).  Plaintiff had

objected that the GTA Indian import data were drawn from a "basket" category of different steel

products that covers items not otherwise classified and might include a range of different

---

[3] In the Preliminary Results of the twenty-third review, the U.S. Department of Commerce ("Commerce" or the "Department") calculated the normal value of all subject merchandise sold during the POR, whether produced by the new producer, Changshan Peer Bearing Company, Ltd., or the previous producer, Peer Bearing Company-Changshan, using FOP normal values pertaining to the TRBs made by the new producer. *Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the People's Republic of China: Preliminary Results of the 2009-2010 Administrative Review of the Antidumping Duty Order and Intent To Rescind Administrative Review, in Part*, 76 Fed. Reg. 41,207, 41,211-12 (Int'l Trade Admin. July 13, 2011) ("*Preliminary Results*"); *Prelim. Surrogate Value Mem.* 2 (June 30, 2011) (Public Admin.R. Part 1 Doc. No. 135) ("*Prelim. Surrogate Value Mem.*").  Commerce valued all steel bar input using a weighted average of the market-economy purchase prices reported by the new producer.  *Preliminary Results*, 76 Fed. Reg. at 41,211-12; *Prelim. Surrogate Value Mem.* at Ex. 12.

materials with widely varying prices.  Pls.' Br. 16.  The court's review of the agency record

revealed "no indication that [Commerce] considered the alternative" of using, as a source of the

surrogate value for this merchandise produced by Peer Bearing Company-Changshan, the prices

SKF paid for steel bar in a market-economy country during the POR.  *Changshan Peer Bearing*,

38 CIT at __, 953 F. Supp. 2d at 1360.  The court directed Commerce to reconsider its choice of

surrogate value data in light of the two data sources on the record.  *Id.* at __, 953 F. Supp. 2d

at 1360, 1364.  The court noted that Commerce is entitled to deference in the interpretation of the

term "best available information."  *Id.* at __, 953 F. Supp. 2d at 1358 (citing *QVD Food Co., Ltd.*

*v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011) ("*QVD Food*")).  The court also stated

that "the selection of the best available information must be consistent with the overall purpose

of the antidumping statute, which is 'to determine margins 'as accurately as possible.'" *Id.*

(quoting *Lasko Metal Prods. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994) ("*Lasko*"), in

turn quoting *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).

        The court discussed the question of the Department's reopening the administrative record

to gather additional data but declined plaintiffs' request that the court direct Commerce to reopen

the record for this purpose, reasoning that the decision to reopen an administrative record on

remand ordinarily is a matter of agency discretion.  *Changshan Peer Bearing*, 38 CIT at __,

953 F. Supp. 2d at 1362-64.  While recognizing that extraordinary circumstances might justify an

order directing Commerce to reopen the record to gather additional information, the court did not

find such circumstances in this case.  *Id.* at __, 953 F. Supp. 2d at 1362.  In considering this

question, the court noted that plaintiffs had been offered opportunities during the review, both in

response to Timken's January 14, 2011 submission of the Indian surrogate data and in response

to the July 13, 2011 Preliminary Results, to submit additional data for use in the surrogate value

determination.  *Id*. at __, 953 F. Supp. 2d at 1363.  For these reasons, the court left to Commerce

the decision of whether or not to reopen the record.  *Id*. at __, 953 F. Supp. 2d at 1365.

In the Remand Redetermination, Commerce decided not to reopen the administrative

record for the submission of additional information and not to modify its valuation of the steel

bar input; i.e., Commerce decided to continue basing its surrogate value for the steel bar input of

the previous producer on the GTA Indian import data.  *Remand Redetermination* 1.  As its reason

for declining to reopen the record, Commerce explained that the record already contained

"reliable and representative data with which to value CPZ/PBCD's consumption of

bearing-quality steel bar."  *Id*. at 13.

D.  The Court Will Affirm the Department's Use of the Indian Import Data to Value the Steel
    Bar Input for the Merchandise Produced by Peer Bearing Company-Changshan

Commerce offered two independent justifications for its continued use of the Indian

import data rather than the market-economy-country purchase data to derive a surrogate value

for the steel bar input of the previous producer, Peer Bearing Company-Changshan.  As one

reason for declining to use the market-economy purchase data, Commerce stated that "under the

Department's practice, ME [market-economy] purchase prices are only used to value the

consumption of inputs for the producer that can demonstrate that it satisfies the 33 percent

threshold because the Department seeks to capture each producer's experience in its valuation of

inputs."  *Remand Redetermination* 6.  In citing the "33 percent threshold," Commerce was

referring to a 2006 Federal Register notice (the "Antidumping Methodologies Notice"), in which

Commerce established a rebuttable 33% threshold for the use of market-economy purchases as a

surrogate value.  *See Antidumping Methodologies: Market Economy Inputs, Expected*

*Non-Market Economy Wages, Duty Drawback; and Request for Comments*, 71 Fed.

Reg. 61,716, 61,717-19 (Int'l Trade Admin. Oct. 19, 2006) ("*Antidumping Methodologies*

*Notice*").  In the Remand Redetermination, Commerce considered CPZ/SKF not to have met

the 33% threshold for the previous producer's steel bar input because record evidence did not

show that CPZ/SKF's market-economy purchases comprised 33% of the total volume of the steel

bar input purchased from all sources and used by CPZ/PBCD to produce subject merchandise

sold by CPZ/SKF during the POR.  *Remand Redetermination* 6.  Commerce also noted that

"[u]nlike CPZ/SKF, there is no evidence on the record with respect to ME purchases of the steel

bar input by CPZ/PBCD during the POR . . . ."  *Id.*

        In *Changshan Peer Bearing*, 38 CIT at __, 953 F. Supp. 2d at 1361, the court observed

that the Antidumping Methodologies Notice "does not appear to foreclose the option" of using

the market-economy purchase data to obtain a surrogate value for the subject merchandise made

by the previous producer.  Because the market-economy purchase data were on the record,

Commerce, as provided in 19 U.S.C. § 1677b(c)(1)(B), was required in this circumstance to

determine which of the two data sources constituted the best available information for use in

determining a surrogate value for this steel bar input.  Had Commerce relied solely on the

Antidumping Methodologies Notice, or the Department's claimed practice, in deciding not to use

the market-economy purchase data for that purpose, the court would not consider the Remand

Redetermination to have complied with the court's order or to rest upon adequate reasoning.

Mere reliance on the Antidumping Methodologies Notice and an existing practice is not, by

itself, sufficient to accomplish a comparison of the two data sources for the purpose of

determining the most suitable surrogate value for the steel bar input of Peer Bearing

Company-Changshan according to the "best available information" standard of 19 U.S.C.

§ 1677b(c)(1)(B).

In providing a second, independent reason for choosing the Indian import data over the market-economy purchase data, Commerce explained that "in evaluating SVs for PRC producers of subject merchandise, the Department prefers to use broad-based, publicly available, non-export, tax-exclusive, and product-specific prices contemporaneous to the POR and from a single country determined to be economically comparable to the PRC." *Remand Redetermination* 4.  Applying these factors, Commerce determined "that the ME purchase prices are not a suitable SV because they: (1) are not representative of CPZ/PBCD's experience because they are SKF's purchases and specific to CPZ/SKF's production, not CPZ/PBCD's production; (2) are not publicly available; (3) are not from an economically comparable country; and (4) are not broad-based market averages." *Id.* at 9.

The market-economy purchase data are decidedly superior to the Indian import data in one significant respect: the market-economy purchase data describe steel bar that SKF actually purchased for use in making TRBs and therefore are specific to the bearing-quality steel input being valued.  In contrast to these data, the Indian import data are acknowledged by Commerce to describe "a basket category" that might contain a variety of other products varying significantly in price.  *Remand Redetermination* 8.  As the court noted in *Changshan Peer Bearing*, "the Indian import data are not particularly specific to the steel bar input being valued and reflect a value much higher than the data from the market economy purchases, which are highly specific to the input being valued." *Id.*, 38 CIT at __, 953 F. Supp. 2d at 1364.  The Remand Redetermination states that Commerce applies each of its factors "non-hierarchically to the particular case-specific facts," *Remand Redetermination* 4, but logic would hold that the relationship between the data under consideration and the factor of production being valued

should be fundamental to the Department's inquiry in meeting the obligation to determine the

dumping margin "'as accurately as possible.'"  *See Lasko*, 43 F.3d 1442, 1446 (citation omitted).

Nevertheless, the market-economy purchase data are inferior to the Indian import data in

another respect, to which the statute speaks directly.  Commerce is to base its surrogate value "on

the best available information regarding the values of such factors in a market economy country

or countries *considered to be appropriate* by" Commerce.  19 U.S.C. § 1677b(c)(1)(B)

(emphasis added), and thus the statute allows Commerce to use actual market-economy purchase

data even if such data do not pertain to a surrogate country that is economically comparable to

China, *see id.*; *Lasko*, 43 F.3d 1445-46; *Shakeproof Assembly Components Div. of Ill. Tool

Works v. United States*, 268 F.3d 1376, 1381 (2001).  But the statute also directs Commerce to

use, "to the extent possible," information from a market-economy country that is economically

comparable to the nonmarket-economy country in which the good was produced.  19 U.S.C.

§ 1677b(c)(4) (directing Commerce to "utilize, to the extent possible, the prices or costs of

factors of production in one or more market-economy countries that are—(A) at a level of

economic development comparable to that of the nonmarket-economy country, and

(B) significant producers of comparable merchandise.").  In the Remand Redetermination,

Commerce cited this statutory directive in support of its decision to use the Indian import data.

*Remand Redetermination* 7-8 & n.25, 9.

Commerce has considerable discretion in choosing the "best available information" on

the record.  *See Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377-78 (Fed.

Cir. 1999); *QVD Food*, 658 F.3d at 1323.  In making that choice, Commerce was justified in

following the statutory guidance favoring data from a country or countries economically

comparable to China.  In this case, the Indian import data were the only record data from an

economically comparable market-economy country relevant to valuation of the previous

producer's steel bar FOP.  The competing data set obtained from the market-economy purchases

not only was from a country not economically comparable to China but also was limited in

scope, being confined to transactions between a single supplier and a single purchaser.  In

considering the governing statute and the record of this case, the court must defer to the

Department's choice.

    E.  The Court Is Not Persuaded by Plaintiffs' Objections to the Remand Redetermination

        Plaintiffs direct numerous arguments against the Remand Redetermination.  The court

does not find merit in these arguments.

        SKF argues, first, that the Remand Redetermination fails to comply with the court's order

because it relies on the Department's practice not to use market-economy purchase prices to

value an input unless the producer made those purchases and unless they comprise 33% of the

quantity of the input obtained from all sources during the POR.  Pls.' Comments 3-7; *id.* at 3

("[T]he court indicated that invocation of the Department's practice was not sufficient and that it

was seeking an explanation justifying application of the practice in this case . . . .").

        The court disagrees that Commerce failed to comply with the court's order.  Although

discussing why using SKF's market-economy purchase prices to value the steel bar input of Peer

Bearing Company-Changshan would be contrary to its practice of applying its 33% threshold,

Commerce also considered the competing data sets as surrogates independently from that

practice.  *Remand Redetermination* 7-10.  In doing so, Commerce decided against using the

market-economy purchase data to value the previous producer's steel bar input, acknowledging

as to specificity that the import data pertained to "a basket category," *id.* at 8, but concluding that

the market-economy purchase data did not satisfy its other criteria of public availability, broad

market average, and exclusivity from taxes and duties, *id*. at 7.  As the court discussed earlier, Commerce also gave weight to the fact that the market-economy purchase data were not from a country "economically comparable to the PRC."  *Id.* (footnote omitted).

SKF next attacks one of the reasons Commerce offered for deciding against the market-economy purchase prices, which was that these prices were not representative of the purchasing experience of the previous producer.  Pls.' Comments 7-9.  According to plaintiffs, "this reasoning is inconsistent with other determinations made by the Department in this and other proceedings," *id*. at 7, and that "[t]he Department may not treat similar situations differently without a rational explanation," *id*.  SKF argues, specifically, that Commerce acted inconsistently in rejecting the use of SKF's market-economy purchase data for valuing the merchandise produced by Peer Bearing Company-Changshan but accepting the same data for use in valuing the SKF-produced merchandise.  *Id.* at 7-8.  SKF notes that its market-economy purchase prices, like the import data, pertained to the current POR but in this review were used to value all SKF-produced subject merchandise, whether produced during the current POR or during previous periods of review.  *Id.*  These arguments fail because this case presents a situation different than those presented by other cases and because, in this case, Commerce gave its reasons in the Remand Redetermination for applying the SKF market-economy purchase data only to steel bar used in SKF-produced merchandise.  In the circumstance presented, it was rational for Commerce to limit the use of the market-economy purchase data to SKF-produced merchandise on the ground that those data are derived from SKF's actual purchasing experience. And as the court discussed previously, Commerce acted within its discretion in giving weight to, among the various factors it considered, the statutory directive to use, to the extent possible, information from a market-economy country economically comparable to China.

Plaintiffs submit that the Department's reasoning "is inconsistent with 19 CFR

§ 351.408(c)(1), which indicates that that [sic] Commerce should normally use market economy

prices when they are available."  Pls.' Comments  9 (footnote omitted); *id.* at 9-12.  In the form

in which it applied to the review in question, the regulation provided in pertinent part as follows:

> *Information used to value factors.*  The Secretary normally will use publicly
> available information to value factors.  However, where a factor is purchased
> from a market economy supplier and paid for in a market economy currency, the
> Secretary normally will use the price paid to the market economy supplier.  In
> those instances where a portion of the factor is purchased from a market economy
> supplier and the remainder from a nonmarket economy supplier, the Secretary
> normally will value the factor using the price paid to the market economy
> supplier.

19 C.F.R. § 351.408(c)(1).  In the review, Commerce followed the practice described in the

second sentence of the regulation when it valued the steel bar factor of production for

SKF-produced merchandise; Commerce thereby used SKF's market-economy purchase prices to

value the steel bar SKF used to make subject merchandise that was sold during the POR.  The

second sentence reasonably may be construed not to apply to the steel bar input of the previous

producer because, on the administrative record relevant to this case, there was no evidence of

market-economy purchases of steel bar by that producer, and in any event there was no evidence

linking that producer to the specific market economy prices at issue in this case.  If SKF's

argument grounded in 19 C.F.R. § 351.408(c)(1) has any validity, therefore, it must be in

reliance on the third sentence in the regulation.

But the third sentence does not unambiguously describe a "normal" practice applicable to

this case.  It is clear that the word "factor" as used in the third sentence refers to "factor of

production," but it is less clear that the term was intended to apply to the separate uses of a single

input (here, bearing-quality steel bar) by two different producers to make different subject

merchandise.  It is at least plausible to interpret the word "factor" to refer to a factor of

production that is specific to an individual producer.  Under this interpretation, the sentence

would not apply where, as here, subject merchandise of two different producers is involved in

the review and only one of the producers made the market-economy purchases.  Some support

for this interpretation can be found in the preamble accompanying promulgation of the

regulation, in which Commerce used the singular term "NME [nonmarket-economy] producer"

in some (but not all) places discussing the new 19 C.F.R. § 351.408(c)(1) provision.

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,366 (Int'l Trade Admin.

May 19, 1997) ("*Preamble*").  The Antidumping Methodologies Notice also suggests that

Commerce interprets its regulation in this way.  *Antidumping Methodologies Notice*, 71 Fed.

Reg. at 61,718 (referring, e.g., to "an NME firm's purchases from market economy suppliers").

Moreover, Commerce determined factors of production on a producer-specific basis, wherever

possible, for the Final Results.  *See Changshan Peer Bearing*, 38 CIT at __, 953 F. Supp. 2d

at 1360; *Decision Mem.* 5-6.  In summary, plaintiff has not made the case that the Department's

reasoning was inconsistent with the normal practice described in 19 C.F.R. § 351.408(c)(1).

    In connection with its argument based on 19 C.F.R. § 351.408(c)(1), SKF gives various

reasons why it believes using the market-economy prices would have been more reasonable and

more consistent with the Department's practices in past cases.  Pls.' Comments 10-11.  Because

the record contains only two data sets relevant to the input at issue, only one of which pertains to

a market-economy country economically comparable to China, this case presents a special fact

pattern that is not analogous to the past administrative proceedings SKF cites.  Also, these prior

administrative proceedings are not binding on Commerce as practice or precedent.

    Describing the bearing-quality steel bar as a "commodity product," plaintiffs next argue

that the Department's claim that Peer Bearing Company-Changshan could not have obtained

bearing-quality steel bar at a price similar to SKF's market-economy purchases is "pure

speculation."  Pls.' Comments 12 (citing *Remand Redetermination* 12).  Commerce, however,

did not reach a factual finding that the previous producer could not have obtained a similar price.

Instead, Commerce made the general point that the market-economy purchase prices "are a

consequence of a business relationship which only existed between CPZ/SKF and its ME

supplier, and so cannot be a reliable proxy for CPZ/PBCD's purchases, from ME suppliers or

not, or contribute to the calculation of accurate dumping margins for the subject merchandise

produced by CPZ/PBCD."  *Remand Redetermination* 12.  The Department's statement, made in

response to SKF's comments objecting to the draft version of the Remand Redetermination, was

directed to the fact that the market-economy purchases were made by SKF, not the previous

producer.  *Id.*  On this record, Commerce permissibly could conclude that SKF's

market-economy purchases had not been shown to have been made at a general market price that

necessarily would have been available to any purchaser or, specifically, to Peer Bearing

Company-Changshan.

     Citing decisions of the court and the obligation of Commerce to calculate the most

accurate margin possible, Pls.' Comments 13-16, SKF argues that "the Department's refusal to

either use the SKF market economy price or to reopen the record to obtain additional data cannot

reasonably be said to be consistent with this duty to calculate the most accurate margins possible

and to use the best available information," *id.* at 13.  For three reasons, the court is not persuaded

by this argument.

     First, *Changshan Peer Bearing* left to Commerce the decision of whether or not to reopen

the record.  One of the reasons for the court's doing so was that SKF, during the administrative

review, did not place on the record additional data for possible use in FOP valuation, despite the

Department's specifically having invited interested parties to make such submissions.

*Changshan Peer Bearing*, 38 CIT at __, 953 F. Supp. 2d at 1363.  The result is a record that

contains only the GTA Indian import data and the market-economy-price data from SKF's own

market-economy purchases.  As the court discussed earlier in this Opinion, each data set on the

record has a shortcoming: the former is less specific to the input being valued than the latter, and

the latter do not pertain to a country that is economically comparable to China.  SKF presents no

convincing reasons why the court should reconsider its decision to leave the question of the

reopening the record to the Department's discretion, and the court sees no justification for such a

reconsideration.

Second, SKF's objection that the Department's choice of the Indian import data over the

market-economy purchase data does not result in use of the best available information, or

produce the most accurate margin possible, is undercut by the statute itself.  Congress expressly

provided that Commerce is to use data from a market-economy country economically

comparable to the nonmarket-economy country "to the extent possible."  19 U.S.C.

§ 1677b(c)(4).

Third, the cases SKF cites are not binding precedent, and each is distinguishable from the

case at bar.  *See* Pls.' Comments 14-16.  SKF cites *Peer Bearing Co.-Changshan v. United*

*States*, 37 CIT __, __, 914 F. Supp. 2d 1343, 1346 (2013), which involved the twenty-first

review of the Order.  That decision concerned the Department's decision on remand to value the

steel bar FOP using Thai import data from the World Trade Atlas ("WTA") after the court had

rejected the decision in the administrative review to use Indian import data from the WTA.  *Id.*

at __, 914 F. Supp. 2d at 1348.  The Thai data showed an average unit value ("AUV") that was

corroborated by three other data sets on the record, each of which was specific to bearing-quality

steel bar: import data for India compiled by Infodrive India ("Infodrive"), data from United

States import statistics, and market-economy purchase data of Peer Bearing

Company-Changshan. *Id.* at __, 914 F. Supp. 2d at 1348-49 & n.3. The Indian import data from

the WTA, which showed a significantly higher value, were not corroborated by these three data

sources or any other data source on the record. *Id.* at __, 914 F. Supp. 2d at 1348. The court

affirmed the decision Commerce made on remand. *Id.* at __, 914 F. Supp. 2d at 1349. In

contrast, this case presents a record with only two data sets. The values obtainable under the two

data sets do not corroborate each other, and no other data set is available on the record to

corroborate either one. Defendant correctly points out that with only two data points on the

record, it cannot be shown that one represents an aberration. Def.'s Opp'n 20.

        In support of their argument that the court should reject the Department's use of the

Indian import data, plaintiffs also rely on *Peer Bearing Co. v. United States*, 36 CIT __, __,

884 F. Supp. 2d 1313, 1317 (2012), which involved a challenge to the final results of the

twenty-second review of the Order. In the final results of that review, Commerce valued the

bearing-quality steel bar FOP using GTA Indian import data for Indian HTS subheading

7228.30.29 but limited its calculation of a surrogate value to Indian import data from three

countries (specifically, the United States, Japan, and Singapore) that it determined from record

evidence had exported bearing-quality steel to India during the period of review. *Id.* at __,

884 F. Supp. 2d at 1331. Commerce excluded from the database imports from countries

(specifically, Austria, Canada, France, Germany, Slovenia, Turkey, and Taiwan) for which

Commerce considered there to be insufficient record evidence to show that those countries had

made exports of bearing-quality steel to India during the period of review. *Id.* To determine the

countries that had exported bearing-quality steel to India, Commerce used record evidence

consisting of import data compiled by Infodrive. *Id.* The Infodrive import dataset for India,

unlike the GTA import data set for India, contained import data specific to goods made of

bearing-quality steel, from which could be obtained an AUV that was considerably lower than

the AUV obtained from the GTA data. *Id.* at __, 884 F. Supp. 2d at 1331-32. The court

remanded the issue with the instruction that Commerce reconsider its surrogate value, "consider

what alternatives are feasible based on the record before it, including in particular the use of the

Infodrive data to determine a surrogate value, and reach a surrogate value shown by substantial

evidence to be based on the best available record information." *Id.* at __, 884 F. Supp. 2d

at 1333. In that case, both the Infodrive data and the GTA data pertained to India, a country

Commerce determined to be economically comparable to China. *Id.* at __, 884 F. Supp. 2d

at 1331. Both information sources, therefore, qualified as information described in 19 U.S.C.

§ 1677b(c)(4) ("prices or costs of factors of production in one or more market economy countries

that are . . . at a level of economic development comparable to that of the nonmarket economy

country . . . ."). That situation is not paralleled here: the market-economy purchase data in the

present case pertain to a developed country and, accordingly, are outside the scope of the

information described in § 1677b(c)(4).

Further, SKF cites *Peer Bearing Co.-Changshan v. United States*, 35 CIT __, 752 F.

Supp. 2d 1353 (2011), *vacated on other grounds, Peer Bearing Co.-Changshan v. United States*,

766 F.3d 1396 (Fed. Cir. 2014), which stemmed from a challenge to the final results of the

twentieth review of the Order. *Id.*, 35 CIT at __, 752 F. Supp. 2d at 1356. In those final results,

Commerce valued the steel bar FOP using online WTA import data for India. *Id.*, 35 CIT at __,

752 F. Supp. 2d at 1360. In addition to these data, the record contained WTA import data from

Indonesia and the Philippines (both of which were countries Commerce determined to be

economically comparable to China) and import data from the United States which, unlike the

other record import data, were specific to bearing-quality steel. *Id.* at __, 752 F. Supp. 2d

at 1370-71. Concluding that the Department's rationale for choosing the Indian import data was

inadequate, the Court remanded the issue for the Department's reconsideration. *Id.* at __, 752 F.

Supp. 2d at 1374. The case is readily distinguished from the case now before the court because

the record in the twentieth review contained alternatives to the Indian WTA data (i.e., the import

data from Indonesia and the Philippines) that satisfied the description in 19 U.S.C. § 1677b(c)(4).

SKF takes issue with the Department's reasoning that the record in this case lacks

evidence that the Indian import data are "'not inclusive of bearing-quality steel bar transactions

or that this Indian HTS subheading is not broadly representative of the value of this input.'"

Pls.' Comments 16 (citing *Remand Redetermination* 8). This argument is unpersuasive because

the Indian HTS subheading, 7228.30.29, expressly includes "bars . . . of other alloy steel." SKF

does not argue, and the court has no reason to conclude, that the scope of the subheading

excludes bearing-quality alloy steel bar based on the terms in the article description for that

subheading. The lack of specificity to the input being valued detracts from the quality of the

Indian import data as a source for the valuation of the input, but standing alone it does not

compel a finding by Commerce that the Indian import data are unreliable or render irrelevant the

statutory disadvantage inherent in the competing data set.

Finally, SKF maintains that in the Remand Redetermination Commerce "relies on

mischaracterizations of SKF's positions with respect to the Indian WTA data," citing the

Department's statement that "'[p]rice information for imports of this Indian HTS subheading has

been generally agreed upon by parties as an appropriate and sufficiently specific source for

valuing steel bar in prior administrative reviews of the TRB antidumping order, and we find no

argument forwarded to the contrary in the instant review.'"  Pls.' Comments 17 (citing *Remand Redetermination* 8-9).  SKF points out that it has not agreed with use of the Indian import data to value steel bar input in prior reviews and, during the review at issue in this case, had no occasion to contest the use of the Indian import data because Commerce valued all steel bar input using SKF's market-economy purchase data in the Preliminary Results.  *Id.* at 17-18.

The sentence SKF quotes from the Remand Redetermination appears to add nothing of value to the Department's analysis.  The reference to positions taken by parties in prior reviews has no apparent relevance to the current review, and the finding of "no argument forwarded to the contrary," *Remand Redetermination* 8-9, appears to allude to a failure by SKF to raise an objection to use of the Indian import data during the administrative proceeding, even though the issue of exhaustion of administrative remedies was not (and in this context properly could not have been) a basis for the Department's decision.  The sentence in question is misguided but, in the context of the Remand Redetermination viewed as a whole, appears to be inconsequential and, therefore, does not constitute a reason to overturn that decision.  As the court has discussed, the decision to choose the Indian import data over the SKF market-economy-country purchase data on the limited evidentiary record is supported by the breadth of the Department's discretion and the stated reliance on 19 U.S.C. § 1677b(c)(4).  *See Remand Redetermination* 7-8 & n.25, 9.

### III. Conclusion

For the reasons stated in the foregoing, the court will affirm the Remand Redetermination and enter judgment accordingly.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Chief Judge

Dated:  February 2, 2015
          New York, NY